UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
JOAO CARLOS SALVADOR GOMES, *pro se*, :
                                        :
                     Plaintiff,         :
                                        :           **OPINION AND ORDER**
           -against-                    :            11-CV-0580 (DLI) (JO)
                                        :
ANGOP, Angola Press Agency, et al.,     :
                                        :
                     Defendants.        :
                                        :
-------------------------------------------------------- x
**DORA L. IRIZARRY, U.S. District Judge:**

On December 29, 2010, *pro se*[1] plaintiff Joao Carlos Salvador Gomes ("Plaintiff")

commenced this action against ANGOP, Angola Press Agency ("ANGOP"), the Republic of

Angola, owner of ANGOP ("Angola"), Embassy of the Republic of Angola in the United States

of America (the "Embassy"), Ministry of Social Communication, Angola ("Ministry of

Communication"), Ministry of Finance, Republic of Angola ("Ministry of Finance"), Ministry of

External Relations (Foreign Affairs), Angola ("Ministry of Foreign Affairs," together with

Ministry of Communication and Ministry of Finance, the "Ministries"),  Mr. Jose Eduardo dos

Santos, President of the Republic of Angola ("President dos Santos"), Mrs. Josefina Pitra

Diakité, Ambassador of the Republic of Angola in the United States of America ("Ambassador

Diakité" or the "Ambassador"), Ms. Carolina Cerqueira, Minister of Social Communication of

the Republic of Angola ("Cerqueira"), Mr. Carlos Alberto Lopes, Minister of Finance of the

Republic of Angola ("Lopes"), Mr. George Chicoty, Minister of External Relations (Foreign

---

[1] The Court is mindful that *pro se* submissions, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Thus, the court interprets the complaint "to raise the strongest arguments that [it] suggest[s]." *Triestman v. Fed. Bureau of Prisons,* 470 F. 3d 471, 474 (2d Cir. 2006) (emphasis omitted).

Affairs), Angola ("Chicoty," together with Cerqueira and Lopes, the "Ministers"), Mr. Manuel

da Conceição, Director of ANGOP ("Conceição") and ANGOP Editorial Staff (collectively,

"Defendants"), by filing a Summons with Notice in New York State Supreme Court, Queens

County, alleging Defendants defamed and otherwise injured Plaintiff when, on multiple

occasions, ANGOP published on its website a photograph of Plaintiff with a caption identifying

him as Jose Americo "Bubo" Na Tchuto, Head of the Navy of Guinea-Bissau (the "Na Tchuto

Photograph"), who at the time of the publication was allegedly wanted internationally for, *inter*

*alia*, "drugs trafficking . . . money laundering, attempted murder of a Head-of-state and,

desertion[.]" (*See* Doc. Entry No. 1, Ex. A ("Summons with Notice") at 5.)   On February 4,

2011, Defendants properly removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a)

and (d).  (*See* Doc. Entry No. 1, Notice of Removal.)

Defendants now move, *inter alia*, to dismiss the complaint as to: (1) President dos Santos

and Ambassador Diakité under Federal Rule of Civil Procedure 12(b)(2) ("Rule 12(b)(2)"),

pursuant to head-of-state and diplomatic immunities; (2) Angola, the Embassy, the Ministries

and ANGOP under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), pursuant to the

Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*; and (3) the

Ministers, Conceição, and ANGOP Editorial Staff, because they have been sued only in their

official capacities and they are not the real parties in interest.  (*See* Defs.' Mem of Law in Supp.

of Mot. to Dismiss ("Defs.' Mem."), Doc Entry No. 12.)  Plaintiff cross-moves, by way of a 505-

page memorandum (the "Omnibus Memorandum"), consisting of 103 single-spaced pages of

argument and 402 pages of exhibits: (1) opposing Defendants' motion to dismiss the complaint;

(2) requesting the Court "Rescind the Notice of Removal" and remand the case back to the

Queens County Supreme Court; and (3) seeking an Order lifting the stay of discovery imposed in

this case by U.S. Magistrate Judge James Orenstein.  (*See* Doc. Entry No. 34 ("Pl.'s Omnibus Mem.").)   Defendants oppose Plaintiff's cross-motions.   For the reasons set forth below, Defendants' motion to dismiss is granted and Plaintiff's motions are denied.   Accordingly, the complaint is dismissed in its entirety for lack of personal and subject matter jurisdiction.

## BACKGROUND

### I.     Factual Allegations[2]

Plaintiff, originally from the Republic of Guinea-Bissau ("Guinea-Bissau"), is a writer and broadcast journalist based in the United States who has written and spoken extensively about, *inter alia*, politics and corruption in Guinea-Bissau and Angola.  (Pl.'s Omnibus Mem. at 28, 32.)  From 1995 to 1996, Plaintiff served as the Spokesman and Head of the Media Division for the United Nations Angola Verification Mission III, the United Nations Mission in charge of mediation of "the Angola Peace Process."  (*Id.* at 32.)  Plaintiff alleges the Angolan Government became hostile to him while he served as the Spokesman because he broadcasted television programs in Angola about, *inter alia*, official corruption and freedom of expression.   (*Id.*) Plaintiff contends that the Angolan Government pressured the United Nations to dismiss Plaintiff from his Spokesman position because of his television broadcasts.  (*Id.*)

Plaintiff further alleges that, as a continuation of the hostilities, on January 6, 2010, Defendants began publishing the Na Tchuto Photograph.  (*Id.* at 28.)  According to Plaintiff, Jose Americo "Bubo" Na Tchuto, Head of the Navy of Guinea-Bissau ("Na Tchuto") is an alleged international drug trafficker, international money launderer and arms trafficker and also is suspected of dealings with terrorist organizations.  (*Id.*)  On January 7, 2010, Plaintiff allegedly contacted ANGOP through its website and asked ANGOP to cease publication of the Na Tchuto

---

[2] The background is drawn from Plaintiff's Summons with Notice originally filed in the Queens County Supreme Court and his Omnibus Memorandum filed in this Court.

Photograph.  (*Id.* at 29.)  Nonetheless, ANGOP allegedly continued publishing different articles about Na Tchuto while using the same photograph identifying Plaintiff as Na Tchuto up until at least April 1, 2010.  (*Id.*)  Plaintiff alleges Defendants published the Na Tchuto Photograph as a means to attack him because of his media legacy in Angola.  (*Id.* at 30, 88.)  Specifically, Plaintiff alleges Defendants have invested $500 million in bauxite mines in Guinea-Bissau, and that the multiple publications of the Na Tchuto Photograph were pre-emptive attacks meant to silence Plaintiff because of his role as a media professional and his known criticism of official corruption.  (*Id.* at 44, 65, 74, 88.)  Plaintiff further asserts that Defendants, in order to secure their investment in Guinea-Bissau, needed Na Tchuto's cooperation, as such, the publications of the Na Tchuto Photograph also were meant to gain Na Tchuto's cooperation by allegedly providing Na Tchuto with an alternative photographic identification, thereby allowing Na Tchuto to move around unrecognized by authorities.  (*Id.* at 53, 69, 85.)

Plaintiff alleges that, on June 10, 2010, at a dinner party, he informed Ambassador Diakité of the Na Tchuto Photograph.  (*Id.* at 31.)  According to Plaintiff, Ambassador Diakité told him: "If the site in question is that of ANGOP, the government of the Republic of Angola will assume its responsibilities."  (*Id.*)  Plaintiff additionally asserts that Ambassador Diakité informed Plaintiff that the publications of the Na Tchuto Photograph may have been the action of an individual inside ANGOP who has a personal vendetta against Plaintiff.  (*Id.*)  Moreover, Plaintiff alleges that during a phone conversation with Ambassador Diakité on June 11, 2010, she blamed the publications on "pirates." (*Id.*)

## II.    Initiation of the State Action and Removal to Federal Court

On December 29, 2010, Plaintiff initiated this action against Defendants by filing a Summons with Notice in the Queens County Supreme Court.  Plaintiff attempted to serve

4

Defendants by sending a copy of the Summons with Notice to the Embassy via Federal Express ("FedEx").  (*See* Doc. Entry No. 1, Ex. B.)  In the Summons with Notice, Plaintiff alleges:

> defamation (libel); violation of right to privacy; harassment; negligence; threat to personal safety and life, through the unauthorized and multiple publication – by ANGOP (Angola Press Agency, the official news agency of the government of Angola) – of plaintiff's photographs and, false words, carried out with reckless disregard for its truth or actual malice on the internet, for commercial purposes (causing special damages).

(Summons with Notice at 5.)  Plaintiff further alleges Defendants' multiple publications of the Na Tchuto Photograph placed Plaintiff "right in the middle of an extremely dangerous web of international intrigue and manhunt." (*Id.* at 6.)  Plaintiff seeks $211 million from Defendants as compensation for "the actual and potential damages" caused by the publications of the Na Tchuto Photograph. (*Id.* at 6-7; Pl.'s Omnibus Mem. at 48.)

On February 4, 2011, Defendants filed a Notice of Removal, removing the action to this Court, pursuant to 28 U.S.C §§ 1441 (a) and (d).  (*See* Doc. Entry No. 1.)  On the same date, Defendants mailed a copy of the Notice of Removal to the Clerk of the Queens County Supreme Court ("Queens County Clerk") and to Plaintiff.  (*See* June 23, 2011 Affirmation of Marjorie E. Berman ("Berman June Affirmation") ¶¶ 4, 5, annexed as Attachment A to Defs.' Opp'n to Pl.'s Mot. to Rescind Notice of Removal and for Remand to the State Court ("Defs.' Remand Opp'n"), Doc. Entry No. 26; *see also* Exs. B and C attached to Berman June Affirmation.)  The Queens County Clerk filed the Notice of Removal on February 7, 2011.  (Berman June Affirmation, Ex. B.)  On February 14, 2011, the magistrate judge sent the parties a Scheduling Order that set an initial conference for March 17, 2011, and encouraged the parties to discuss possible settlement terms before the conference date.  (*See* Doc. Entry No. 2.)

### III.   Proceedings Before the Magistrate Judge

During the March 17, 2011 Scheduling Conference, Defendants asserted that if a settlement could not be reached they would likely move to dismiss the complaint, in part, because Plaintiff allegedly failed to effect proper service on Defendants pursuant to the FSIA. (*See* Scheduling Conference Transcript dated March 17, 2011 ("Sched. Tr.") at 4-7, 21, Doc. Entry No. 29.)  The magistrate judge questioned whether Defendants could remove the case if Defendants asserted they never were properly served in the first instance.  (*Id.* at 5.)  The magistrate judge therefore directed Defendants to submit a letter to the Court providing authority that a removal is proper before service has been effected.  (*Id.*)

Also during the Scheduling Conference, Plaintiff stated he never received the Notice of Removal from Defendants by mail and that he obtained a copy of the Notice of Removal on March 16, 2011, the day before the conference, from the Clerk's Office in this Court.  (*Id.* at 7-10, 26-28, 39.)  Plaintiff acknowledged that he received the Scheduling Order and that he was aware of the March 17, 2011 Scheduling Conference.  (*Id.* at 8-9.)  Moreover, pursuant to the Order, the parties discussed possible settlement terms on two occasions prior to the Settlement Conference.  (*Id.*; *see also* June 23, 2011 Affirmation of Andrew Z. Schwartz ("Schwartz Affirmation") ¶¶ 3-6, annexed as Attachment B to Defs.' Remand Opp'n.)

Defendants represented that to the best of their knowledge they sent the Notice of Removal to Plaintiff, and that while they could not account for why it was not received, Defendants were in possession of an Affidavit of Service in their office file.  (*Id.* at 8-9.)  The magistrate judge directed Defendants to file the Affidavit of Service on the Court's CM/ECF System and to provide a copy to Plaintiff.  (*Id.* at 40.)  On March 18, 2011, pursuant to the magistrate judge's Order, Defendants filed a copy of their Affidavit of Service.  (Doc. Entry No.

7.)  Defendants now acknowledge that they made a typographical error in Plaintiff's address on the Affidavit of Service.  Defendants suggest this explains why Plaintiff never received the Notice of Removal in the mail.  (*See* Berman June Affirmation ¶ 10, Ex. C.)  On the same date, Defendants e-mailed the Affidavit of Service to Plaintiff.  (*Id.* ¶ 12, Ex. E; *see also* Sept. 16, 2011 Affirmation of Marjorie E. Berman ("Berman Sept. Affirmation") ¶ 3, annexed as Ex. 1 to Defs.' Reply in Supp. of their Mot. to Dismiss ("Defs.' Rep. Mem."), Doc. Entry No. 38.)  Plaintiff asserts he never received that e-mail.  (Pl.'s Omnibus Mem. at 14.)

On April 28, 2011, after reviewing submissions from both parties, the magistrate judge concluded that Defendants' removal was proper.  (*See* ECF Order dated April 28, 2011.)  On May 5, 2011, Defendants moved to stay discovery pending the outcome of their motion to dismiss.  (*See* Doc. Entry No. 17.)  On May 18, 2011, the magistrate judge granted Defendants' motion to stay discovery pending the resolution of the Defendants' motion to dismiss the complaint.  (*See* Doc. Entry. No. 21.)

## DISCUSSION

**I.    Motion to Rescind the Notice of Removal**

Plaintiff seeks remand on the ground that Defendants failed to complete the removal process, pursuant to 28 U.S.C. § 1446 because they did not serve Plaintiff with a written Notice of Removal or with Proof of Service and, thus did not comply with the thirty-day deadline in which to complete the removal process.[3]  (*See* Pl.'s Affirmation in Supp. of the Mot. to Rescind ("Pl.'s Mot. to Rescind") ¶¶ 1, 7, Doc. Entry No. 23; *see also* Pl.'s Omnibus Mem. at 9, 16.)

---

[3] Plaintiff does not contend that, absent the purported service error, the removal was improper, nor can he, because pursuant to 28 U.S.C. § 1441(d) "[a]ny civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending."

Plaintiff's motion to remand is denied.

As an initial matter, Plaintiff's assertion that he received no documentation regarding the removal is belied by the record.  Plaintiff himself acknowledged that he obtained a copy of the Notice of Removal from this Court's Clerk's Office on March 16, 2011.  (Sched. Tr. at 7-10, 26-28, 39.)  Plaintiff also acknowledged that he learned the matter was removed to this Court from the Scheduling Order sent by the magistrate judge on February 14, 2011, notifying him that a Scheduling Conference would be held on March 17, 2011.  (Sched. Tr. at 9 ("I received the court papers, the notice from the Court.").) Moreover, on March 18, 2011, pursuant to the magistrate judge's instructions, Defendants electronically filed a copy of their proof of service and e-mailed a copy to Plaintiff directly.  (Doc. Entry No. 7; *see also* Berman Sept. Affirmation ¶ 3, Ex. 1.) As such, the issue here is not, as Plaintiff contends, whether he received notification of the removal at all.  Rather, the issue is whether the notification Plaintiff received satisfies 28 U.S.C. § 1446, the statute governing the procedure for removal of civil actions.

Pursuant to 28 U.S.C. § 1446(b), a defendant must file, "through service or otherwise," a notice of removal in the district court within thirty days of receipt of the initial pleading.   FedEx delivery confirmation shows Defendants received Plaintiff's purported service at the Embassy on January 5, 2011.  (*See* Pl.'s Omnibus Mem., Ex. H.)  Defendants filed the Notice of Removal in this Court on February 4, 2011, thirty days after they received Plaintiff's purported service, in compliance with 28 U.S.C. § 1446(b).  (*See* Doc. Entry No. 1, Notice of Removal.)

Pursuant to 28 U.S.C. § 1446(d), "[p]romptly" after filing the notice of removal in district court, a defendant "shall [1] give written notice thereof to all adverse parties and shall [2] file a copy of the notice with the clerk of such State court[.]"  Here, Defendants complied with this requirement when they mailed a copy of the Notice of Removal to the Queens County Clerk on

8

February 4, 2011.  The Queens County Clerk entered the Notice of Removal on the state court docket on February 7, 2011, three days after the Notice of Removal was filed in this Court. (Berman June Affirmation, Ex. B.)

Apparently, Plaintiff contends that Defendants failed, in part, to adhere to 28 U.S.C. § 1446(d) because they did not serve him promptly with written Notice of the Removal.  Plaintiff's assertion is without merit.  While 28 U.S.C. § 1446 requires the removing party to "promptly" give its adversary "written notice" that a notice of removal has been filed, it "does not require that the removing party deliver an actual copy of the notice of removal to its adversary."  *Park v. McGowan*, 2011 WL 4963759, at *4 n.3 (E.D.N.Y. Oct. 19, 2011).  Moreover, 28 U.S.C. § 1446(d) itself does not define the term "promptly."  Courts in this Circuit have construed promptness to depend upon the circumstances of an individual case and have held that constructive notice may be sufficient to satisfy the demands of the statute.  *See, e.g., Ynoa v. Kutner*, 2011 WL 1796320, at *2 (S.D.N.Y. May 5, 2011) (collecting cases) ("[S]everal courts [in this Circuit] have held that delays of more than a month in either filing the notice of removal with the state court or providing plaintiffs with written notice do not necessarily require remand."); *McCall v. Greyhound Lines, Inc.*, 1998 WL 865626, at *2 (S.D.N.Y. Dec. 11, 1998) ("It is clear that constructive notice may be sufficient notice for the purposes of the statute." (citation omitted)).  Further, where there has been some delay between when a defendant files a notice of removal and when a defendant provides a plaintiff with written notice that the removal has been filed, but where the plaintiff has not been prejudiced by the delay, remand is not required.  *See Calderon v. Pathmark Stores, Inc.*, 101 F. Supp. 2d 246, 248 (S.D.N.Y. 2000) ("[W]here, as here, the [month-long] delay was relatively short and no action was taken by the state court between the time of actual removal and the time of the requisite notice, the alleged

9

defect is harmless and, not being jurisdictional, creates no basis for remand.").

Here, there is no dispute that Defendants listed Plaintiff's address incorrectly on the Affidavit of Service, and, accordingly, that they probably served the Notice of Removal on the wrong address.[4]  But there is nothing to suggest this typographical error was made in bad faith. Moreover, as Plaintiff concedes, he was notified of the removal by way of the magistrate judge's February 14, 2011 Scheduling Order, which is dated only ten days after the Notice of Removal was filed.   Accordingly, the Court finds taht Plaintiff's receipt of the magistrate judge's Scheduling Order within days after the Notice of Removal was filed, constitutes constructive notice that the instant matter was removed to this Court, in satisfaction of the promptness requirement of 28 U.S.C. § 1446(d).  *See Greyhound Lines, Inc.,* 1998 WL 865626, at *2 (finding that plaintiff received constructive notice of removal shortly after the notice was filed when she received an order from the federal court directing the parties to appear for an initial conference).

Plaintiff nonetheless asserts Defendants' "failure to serve process, in a timely fashion, undoubtedly affected the Plaintiff's ability to conduct research, fully understand what was involved, and, adequately prepare himself, ahead of the pre-trial conference of March 17, 2011. As a result, the Plaintiff's right to due process was seriously affected."  (Pl.'s Omnibus Mem. at 11.)  While the Court is sympathetic to Plaintiff's frustration at Defendants conceded error in mailing the written Notice of Removal to an incorrect address, Plaintiff was not prejudiced by mailing error because: (1) he received constructive notice of the removal a short time after it was filed; (2) no action occurred in the State court subsequent to the filing of the Notice of Removal

---

[4] The Affidavit of Service erroneously lists Plaintiff's address as 34-36 92nd Street. (*See* Doc. Entry No. 7.)  While Plaintiff's correct address, as noted on the Summons with Notice that he filed in state court, is 34-46 92nd Street.  (*See* Summons with Notice at 3.)

with this Court; and (3) Plaintiff received a copy of the Notice or Removal prior to the first Scheduling Conference.   Moreover, nothing dispositive occurred during the Scheduling Conference.  The parties merely discussed possible settlement terms and agreed on the briefing schedule for motions.  These administrative acts did not affect Plaintiff's due process rights.

Plaintiff also contends that Defendants' "failure to serve process was a calculated, deliberate and intentional strategy designed to take advantage of the Plaintiff's clearly stated willingness to settle the case and; [sic] of his lack of knowledge of the system and, ignorance of the procedures, which the defendants are well aware of."  (*Id.* at 15.)  The Court disagrees. There is no evidence in the record to support Plaintiff's allegations.

The Court finds Defendants' removal was proper.  Accordingly, Plaintiff's motion to remand the instant matter is denied.

## II.     Motion to Dismiss Pursuant to Rule 12(b)(2)

Defendants move to dismiss the complaint as to President dos Santos and Ambassador Diakité under Rule 12(b)(2) on the ground that the Court lacks personal jurisdiction over them. Specifically, Defendants argue:  (1)  President dos Santos is immune from the jurisdiction of this Court under the common law doctrine of head-of-state immunity; and (2) Ambassador Diakité is immune pursuant to the Vienna Convention on Diplomatic Relations ("VCDR") and the Diplomatic Relations Act of 1978 ("DRA"), 22 U.S.C. § 254d.  Plaintiff argues Defendants are not entitled to sovereign immunity.  As set forth below, the Court finds President dos Santos and Ambassador Diakité are immune from the jurisdiction of the courts of the United States. Accordingly, this action is dismissed against them.

### A.  Rule 12(b)(2) Legal Standard

"A court is obligated to dismiss an action against a defendant over which it has no

personal jurisdiction upon motion by that defendant." *TAGC Mgt., LLC v. Lehman*, 2011 WL 3796350, at *3 (S.D.N.Y. Aug. 24, 2011) (internal quotations omitted).  "A plaintiff opposing a motion to dismiss a complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) bears the burden of establishing that the court has jurisdiction over the defendant." *Id.* (internal quotations omitted). When, as here, "a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  "Although a plaintiff's allegations are ordinarily accepted as true at the pleadings stage, on a motion to dismiss for lack of jurisdiction, where [a] 'defendant rebuts [a] plaintiff['s] unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction-and plaintiff[ ] do[es] not counter that evidence-the allegation may be deemed refuted."   *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,* 425 F.Supp.2d 402, 420 (S.D.N.Y.2006) (*quoting Schenker v. Assicurazioni Genereali S.p.A ., Consol.,* 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002)).

     *B.  President dos Santos*

Defendants argue the Court lacks personal jurisdiction over President dos Santos under the common law doctrine of head-of-state immunity.  Consequently, Defendants assert the action must be dismissed against him.  (*See* Defs.' Mem. at 14.)  Plaintiff contends President dos Santos is not entitled to immunity because, *inter alia*, of alleged past corrupt and/or criminal actions undertaken by him for personal profit.  (Pl.'s Omnibus Mem. at 85-89.)  The Court holds that President dos Santos is entitled to head-of-state immunity and this action is dismissed against him.

"A head-of-state recognized by the United States government is absolutely immune from

personal jurisdiction in United States courts unless that immunity has been waived by statute or by the foreign government recognized by the United States." *Lafontant v. Aristide*, 844 F. Supp. 128, 131-32 (E.D.N.Y. 1994) (citations omitted).  On May 19, 1993, the United States formally recognized the Government of Angola and President Jose Eduardo dos Santos as Angola's head-of-state.  *See* William J. Clinton, U.S. President, *Statement Regarding U.S. Recognition of Angolan Government* (May 19, 1993), *in* U.S. Department of State Dispatch Magazine Vol. 4, No. 21, May 24, 1993 ("Today I am pleased to announce the United States' recognition of the Government of Angola."); *see also* U.S. Department of State Background Note: Angola, Apr. 25, 2012, http://www.state.gov/r/pa/ei/bgn/6619.htm (last visited July 7, 2012) (recognizing the Government of Angola and President Jose Eduardo dos Santos as its head-of-state).  Indeed, Plaintiff acknowledges that President dos Santos is the head-of-state of Angola.  (*See, e.g.,* Pl.'s Omnibus Mem. at 39 ("President Jose Eduaro dos Santos is responsible for the design and implementation of all the policies of the government and, is the top decision-maker in the country for all areas of the government, including ANGOP.").)  As such, absent a waiver of this immunity by statute or by Angola, President dos Santos is immune from the jurisdiction of the Court under the doctrine of head-of-state immunity.

Plaintiff has made no allegation that President dos Santos' immunity was waived by statute or by the Republic of Angola.  Instead, Plaintiff questions the validity of the head-of-state immunity doctrine itself.  (*See* Pl.'s Omnibus Mem. at 85 ("there is no exact legal formula for deciding who qualifies for head-of-state immunity").)  He sets forth a detailed history of alleged corrupt actions taken by President dos Santos that are unrelated to the instant action, and questions whether President dos Santos should be considered the legitimate president of Angola. (*Id.* at 85-89.)  Plaintiff's incredulity at the validity of head-of-state immunity notwithstanding,

the United States Supreme Court has recognized this doctrine for nearly 200 years.  *See Lafontant*, 844 F. Supp. at 132 (noting that the absolute immunity afforded a head-of-state, first recognized by the Supreme Court as early as 1812, is based on the notion that all states are equal and the doctrine of comity).  As the United States currently recognizes President dos Santos as the head-of-state of Angola and, since Plaintiff fails to allege facts showing that President dos Santos' immunity has been waived by statute or by Angola, this action is dismissed against him.

### C.  Ambassador Diakité

Defendants next assert that Ambassador Diakité is immune from the jurisdiction of this Court pursuant to the VCDR and the DRA.  (Defs.' Mem. at 14-15.)  Plaintiff contends, *inter alia*, that, because Ambassador Diakité acted outside her official functions by engaging in actions for commercial and personal profit, an exception to diplomatic immunity under the VCDR applies, making her subject to the jurisdiction in this Court.  (Pl.'s Omnibus Mem. at 89-90.)  The Court finds that Ambassador Diakité is immune from the Court's jurisdiction. Therefore, this action against her is dismissed.

Article 31 of the VCDR, to which the United States is a party, grants diplomatic agents full immunity subject to certain limited exceptions that are not applicable here.  *See* The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, *entered into force with respect to the United States* Dec. 13, 1972, 23 U.S.T. 3227; *see also Swarna v. Al-Awadi*, 622 F. 3d 123, 137 (2d Cir. 2010) ("Sitting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service for his or her government.").  As Plaintiff acknowledges, Ambassador Diakité was head of Angola's principal mission to the United States, the Embassy of Angola in Washington D.C., at the time this suit was commenced.  (*See* Pl. Omnibus Mem. at 31, 42.)  As such, she qualifies as a diplomatic agent under to the VCDR and is entitled to

absolute immunity.  *See* VCDR, Art. 1(e) ("a 'diplomatic agent' is the head of the mission or a member of the diplomatic staff of the mission").  Moreover, under the DRA, "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed."  22 U.S.C. § 254d.  Accordingly, pursuant to the DRA, as no exceptions to immunity under the VCDR are applicable to Ambassador Diakité, the instant suit against her must be dismissed.  *See Brzak v. United Nations*, 597 F. 3d 107, 113 (2d Cir. 2010), *cert. denied* 131 S.Ct. 151 (2010) (The DRA "makes pellucid that American courts must dismiss a suit against anyone who is entitled to immunity under. . . the VCDR[.]").

Plaintiff argues that Ambassador Diakité is not entitled to immunity, pursuant to VCDR Art. 31(1)(c), which provides an exception to diplomatic immunity in the case of, *inter alia*, "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."  (Pl.'s Omnibus Mem. at 89 (citing VCDR, Art. 31(1)(c).)  Specifically, Plaintiff asserts the Ambassador took actions outside her official function because she: (1) unduly used her "official position to engage in activities such as money laundering"; (2) disseminated material from the official news agency of Angola; and (3) "has been directly involved, representing the defendants in all aspects of the proceedings involving this case, with respect to all discussion, correspondence, hiring of the counsels, the actual legal proceedings, etc."  (Pl.'s Omnibus Mem. at 90.)  These assertions are speculative and do not provide any support for the claim that Ambassador Diakité engaged in acts outside of her official capacity.

Plaintiff's first argument, that Ambassador Diakité engaged in money laundering is wholly conclusory, not supported by any factual allegations in the record, and is entirely

unrelated to the narrow action at issue, viz., the publications of the Na Tchuto Photograph.  As such, even assuming, *arguendo*, such money laundering did occur, Plaintiff has not pled any facts connecting the alleged criminal act with the instant action, thereby warranting an application of the exception to sovereign immunity under the VCDR.  Moreover, Plaintiff pleads no facts and provides no argument tending to show that Ambassador Diakité's alleged actions of disseminating material from the official news agency of Angola is not in accord with her official function as "the representative of the government of Angola in the United States[.]" (Pl.'s Omnibus Mem. at 31.)   Similarly, Plaintiff also has provided no evidence to support his contention that Ambassador Diakité's action of "hiring the counsels and overseeing all aspects of this legal action . . . are outside her official obligations." (*Id.* at 90.)  To the contrary, the Court finds it hard to imagine that Ambassador Diakité's supervision of this litigation on behalf of the country and institutions she represents, in the location where she represents them, can be construed as anything other than a core aspect of her official function.

Plaintiff also asserts that Ambassador Diakité should not be granted immunity under VCDR, Art. 41(3), which states:  "The premises of the mission must not be used in any manner incompatible with the functions of the mission[.]"  According to Plaintiff, "[i]t is possible that the articles which are the subject of this legal action were written and published by an ANGOP staff member based in the United Sates, including possibly, at the Embassy of Angola[.]" (Pl.'s Omnibus Mem. at 89.)  This assertion does not rise above bald speculation and is insufficient to meet Plaintiff's burden of establishing that the Court has jurisdiction over Ambassador Diakité.

Plaintiff has failed to allege facts showing that Ambassador Diakité is not entitled to immunity under the VCDR.  Accordingly, pursuant to the mandates of the DRA, this action is dismissed as to her. *See Brzak*, 597 F. 3d at 113.

III.     **Motion to Dismiss Pursuant to Rule 12(b)(1)**

Defendants move to dismiss the complaint pursuant to Rule 12(b)(1) as to Angola, the Embassy, the Ministries and ANGOP (collectively, the "FSIA Defendants") on the ground that they are all foreign states protected by sovereign immunity under the FSIA and, accordingly, the Court lacks subject matter jurisdiction over the claims against them.   Plaintiff asserts that Defendants are not entitled to sovereign immunity under the FSIA and, even if they are so entitled, that one or more FSIA exception applies, such that this Court has subject matter jurisdiction over the FSIA Defendants.   As set forth below, the Court finds it lacks subject matter jurisdiction over the claims alleged against the FSIA Defendants.   Accordingly, the action against them is dismissed.

A.   *Rule 12(b)(1) Legal Standard in the Context of the FSIA*

The FSIA provides the sole basis for the exercise of jurisdiction over a foreign state in United States courts.  *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also USAA Cas. Ins. Co. v. Permanent Mission of Repub. of Namibia*, 681 F. 3d 103, 107 (2d Cir. 2012).  Under the FSIA, a foreign state includes the foreign sovereign itself as well as its political subdivisions, agencies and instrumentalities.  *See* 28 U.S.C. §§ 1603(a) and (b); *see also* H.R. Rep. No. 94-1487, at 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613.  A foreign state is presumptively immune from the jurisdiction of United States courts unless a specified exception to the FSIA applies.  *See* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.").  Accordingly, absent the applicability of an exception set forth in 28 U.S.C. §§ 1605 to 1607, a federal court lacks subject matter jurisdiction over any claims brought against a foreign state.  *USAA Cas. Ins. Co.*, 681 F. 3d at 107.

In the context of a Rule 12(b)(1) challenge to subject matter jurisdiction under the FSIA, the Court looks to "the substance of the allegations to determine whether one of the exceptions to the FSIA's general exclusion of jurisdiction over foreign sovereigns applies." *Robinson v. Government of Malaysia*, 269 F. 3d 133, 140 (2d Cir. 2001) (internal quotation marks and citations omitted). Moreover, where a foreign state moves to dismiss a complaint on the grounds that the court lacks jurisdiction over the foreign state, "the Court *must* look beyond the pleadings to the factual record to determine whether to grant the motion to dismiss." *Servaas Inc. v. Repub. of Iraq*, 686 F. Supp. 2d 346, 353-354 (S.D.N.Y. 2010) (citations omitted) (emphasis in original).

In determining whether a court lacks jurisdiction over a defendant pursuant to the FSIA, the defendant has the burden to "present a *prima facie* case that it is a foreign sovereign." *Virtual Countries, Inc. v. Repub. of South Africa*, 300 F. 3d 230, 241 (2d Cir. 2002) (internal quotations omitted). Once the defendant meets that initial burden, "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Rogers v. Petroleo Brasileiro, S.A.*, 673 F. 3d 131, 136 (2d Cir. 2012) (quoting *Kensington Int'l Ltd. v. Itoua*, 505 F. 3d 147, 153 (2d Cir. 2007)). The plaintiff may meet his burden through the allegations contained in the complaint and the undisputed facts placed before the court by the parties. *See Virtual Countries*, 300 F. 3d at 241 (citation omitted). "Where the plaintiff satisfies [his or] her burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply." *Swarna*, 622 F. 3d at 143 (citation omitted).

As discussed further below, the Court concludes that: (1) the FSIA Defendants have sustained their *prima facie* burden of establishing they are foreign sovereigns under the FSIA;

18

and (2) Plaintiff has failed to meet his burden by coming forward with evidence showing, under an exception to the FSIA, that the FSIA Defendants should not be granted sovereign immunity. Consequently, the Court finds the FSIA Defendants are immune from the jurisdiction of the courts of the United States and the complaint is dismissed in its entirety as to them.

### B. The FSIA Defendants' Prima Facie Case

#### i. Angola, the Embassy, and the Ministries

There can be no dispute that Angola is a foreign state to which the presumption of immunity attaches under the FSIA. *See, e.g., Garb v. Repub. of Poland*, 440 F. 3d 579, 589 (2d Cir. 2006) (Noting that "the Republic of Poland is not an agency or instrumentality of a foreign state, because it is the foreign state itself." (citation and internal quotations omitted)). Therefore, absent the applicability of an FSIA exception, the Republic of Angola is immune from the jurisdiction of this Court. 28 U.S.C. § 1604.

It is also beyond peradventure that the Embassy, which Plaintiff concedes "represents the country of Angola and all of its institutions in the United States," (Pl.'s Omnibus Mem. at 42), is the "embodiment" of the foreign state that is "entitled to rely on the defense of sovereign immunity unless an exception to the FSIA applies." *USAA Cas. Ins. Co.*, 681 F. 3d at 107 (citation omitted); *see also Gray v. Permanent Mission of People's Repub. of Congo*, 443 F. Supp. 816, 819 (S.D.N.Y.), *aff'd*, 580 F.2d 1044 (2d Cir. 1978) (table decision) ("There can be no doubt that the Congo Mission is a foreign state within the meaning of [the FSIA].").

The Ministries are political organs of Angola that also are entitled to the presumption of immunity under the FSIA. Pursuant to Presidential Decree Legislative Act No. 1/10 ("Decree 1/10") issued on March 5, 2010, President dos Santos set forth the organizational structure and functions of the organs necessary for the exercise of his powers under the 2010 Angola

Constitution.  (*See* Decree 1/10, annexed as Ex. B to Defs.' Mot. to Dismiss.)  As Plaintiff readily concedes, under Decree 1/10, the Ministries are all defined as "auxiliary organs of the President of the Republic and Head of the Executive in governance and administration functions of their respective sectors, which correspond to specific areas of activity, in accordance with delegated powers."  (Pl.'s Omnibus Mem. at 37-38 (citing Decree 1/10, Art. 18(1)).)  Furthermore, as set forth in Decree 1/10, the core functions of the Ministries are exclusively governmental in purpose.[5]  (*See* Decree 1/10, Arts. 22, 26, 32, 34.)  For purposes of the FSIA, the Ministries, as organs of the state with core governmental functions, are considered the foreign state itself and are entitled to the presumption of immunity.  *See Garb*, 440 F. 3d at 594-95, 598 (Since the core function of Poland's Ministry of the Treasury is governmental, rather than commercial, it is treated as the part of the sovereign itself and not as the sovereigns' agency or instrumentality.); s*ee also Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n*, 361 F. 3d 676, 688 (2d Cir. 2004) (Finding "no meaningful legal distinction can be drawn between a sovereign and one of its political organs."); *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007) (Iran's Ministry of Information and Security "is considered to be a division of state of Iran, and is treated as a member of the state of Iran itself" for purposes of the FSIA.).  Accordingly, Angola, the Embassy, and the Ministries are foreign states under the

---

[5] The mission of the Ministry of Foreign Affairs is to "propose, formulate, plan, coordinate, implement, evaluate and report on the external policy and international cooperation of the Republic of Angola, for the affirmation of the country and defense of national interests in the international context." (Decree 1/10, Art. 26.)  The mission of the Ministry of Social Communications is to "propose the formulation, conduct, implementation and evaluation of the policy of the Executive in the field of social communications as well as ensuring institutional communications." (*Id.*, Art. 32.)  The mission of the Ministry of Finance is to "propose the formulation, conduct, implementation, and evaluation of the financial policy of the State, promoting the rational management of public financial resources and the internal and external balance of public accounts, as well as the general inspection and supervision of public finances." (*Id.*, Art. 34.)

FSIA that are entitled to the presumption of sovereign immunity.

         i.  ANGOP

Defendants assert that, because ANGOP is an agency or instrumentality of Angola, as defined by the FSIA, it also is a foreign state immune from the jurisdiction of this Court.  (Defs.' Mem. at 7.)  Plaintiff argues ANGOP does not meet the definition of agency or instrumentality under the FSIA.  (Pl.'s Omnibus Mem. at 77-79.)  The Court finds that ANGOP is an agency or instrumentality of Angola, and it presumptively is immune from the Court's jurisdiction.

Pursuant to the FSIA, a foreign state includes "an agency or instrumentality of a foreign state as defined under subsection (b)."  28 U.S.C. § 1603(a).  Subsection (b) provides:

> (b) An 'agency or instrumentality of a foreign state' means any entity—
>
> (1) Which is a separate legal person, corporate or otherwise, and
>
> (2) Which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) Which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) ("Section 1603(b)").

Plaintiff apparently concedes that ANGOP meets the requirements under Sections 1603(b)(2) and (3).  Indeed, Plaintiff repeatedly asserts that Angola is the sole owner of ANGOP, "a component of the state media."  (*See, e.g.,* Pl.'s Omnibus Mem. at 34, 38.)  Furthermore, as set forth in the sworn statement of Manuel da Conceição, President of the Board of Directors of ANGOP, the Government of Angola created ANGOP as a state media organ in 1975 for the national purpose of collecting, preparing and distributing current national and international news

on the basis of objective information in line with the national interest.  (*See* April 6, 2011 Sworn Statement of Manuel da Conceição, President, ANGOP Board of Directors ("Conceição April Statement") ¶ 2, annexed as Ex. C to Defs.' Mot. to Dismiss; *see also* Decree No. 208/10 of the 24th of September 2010 ("Decree 208/10"), Arts. 4(1)(a)-(d), attached as Ex. A to Conceição April Statement.)  As such, the requirements of Section 1603(b)(2) are met.  Defendants also affirm, by way of Conceição's sworn statement, that ANGOP is neither a citizen of a State of the United States nor is it created under the laws of any third country, as it is created under Angola law.  (*See* Conceição April Statement ¶ 6.)  Plaintiff does not challenge this representation. Accordingly, the requirements of Section 1603(b)(3) also are met.

The parties contest whether Section 1603(b)(1) has been satisfied.  Defendants maintain that Section 1603(b)(1) is met because, as Conceição affirms, ANGOP is a separate legal person. (*See* Conceição April Statement ¶ 3 ("ANGOP has its own legal (juridical) personality separate from the Government of Angola.  It has an autonomous administration and management, and it owns and controls its own assets.  It can sue and be sued in its own name, and it can sign and perform contracts in its own name."); *see also* Decree 208/10, Art. 1 ("ANGOP, is a public enterprise of great dimension and public interest, endowed with juridical personality[.]").) Plaintiff argues ANGOP is not a legal person separate from Angola because:  (1) Angola gives ANGOP political direction; and (2) ANGOP receives funding increases only by approval of the Ministry of Finance and the Ministry of State for Economic Coordination.  (*See* Pl.'s Omnibus Mem. at 81-84.)

It is well settled that "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status."  *EM Ltd. v. Rep. of Argentina*, 389 F. App'x 38, 43 (2d Cir. 2010) (quoting *First National City Bank v. Banco Para El Comercio Exterior de Cuba*

(*"Bancec"*), 462 U.S. 611, 627 (1983)). A plaintiff has the burden of overcoming this presumption of separateness. *See De Letelier v. Repub. of Chile*, 748 F. 2d 790, 795 (2d Cir. 1984). Here, Plaintiff may overcome this burden by showing that: (1) ANGOP "is so extensively controlled by [Angola] that a relationship of principal and agent is created" or (2) recognition of ANGOP's separate juridical status "would work fraud or injustice." *NML Capital, Ltd. v. Banco Central de la Repub. Argentina*, 652 F. 3d 172, 180 (2d Cir. 2011) (quoting *Bancec*, 462 U.S. at 629.) However, Plaintiff has not alleged facts that overcome the presumption of separateness accorded to ANGOP.

Plaintiff first asserts that Angola directed ANGOP to commit the alleged tort. (*See* Pl.'s Omnibus Mem. at 81, 84 ("[I]t is clear that the publication of Plaintiff's photographs were clearly approved by" various ministry officials.). Even assuming, *arguendo*, Angola and ANGOP were joint tortfeasors, "[j]oint participation in a tort is not the 'classic' abuse of corporate form" that warrants piercing the independent status of the foreign corporate entity. *Liu Bo Shan v. China Const. Bank Corp.*, 421 F. App'x 89, 93 (2d Cir. 2011) (quoting *De Letelier*, 748 F. 2d at 794).

Plaintiff also contends that recognizing ANGOP as a separate juridical entity would work fraud or injustice. Specifically, Plaintiff theorizes that Decree No. 208/10, which endows ANGOP with independent status, was issued by President dos Santos directly in response to the underlying litigation as a means to "reinforc[e] the notion of ANGOP having an independent body." (Pl.'s Omnibus Mem. at 84.) There is nothing in the record to support this speculative assertion and this unsupported allegation is insufficient to overcome ANGOP's presumption of independent status.

Finally, Plaintiff fails to support his claim that, because ANGOP's funding increases

must be approved by the Ministry of Finance and the Ministry of State for Economic Coordination, ANGOP's status as a separate juridical entity should be ignored. Accordingly, the Court finds that Section 1603(b)(1) also is met and that ANGOP is a foreign state under the FSIA that is entitled to the presumption of sovereign immunity.

### C. Exceptions to the Presumption of Sovereignty of the FSIA Defendants

Defendants have met their *prima facie* burden of establishing they are entitled to the presumption of sovereign immunity, as such Plaintiff has the burden of coming forward with evidence showing that an the exception to the immunity applies. *See Rogers*, 673 F. 3d at 136. Plaintiff argues that there are three exceptions to the FSIA Defendants' presumption of sovereign immunity applicable here:  (1) Ambassador Diakité implicitly waived the FSIA Defendants' immunity under 28 U.S.C. § 1605(a)(1); (2) the FSIA Defendants are not immune under the "commercial activities exception," 28 U.S.C. § 1605(a)(2); and (3) the FSIA Defendants are not immune under the "tortious activity exception," 28 U.S.C. § 1605(a)(5).  As set forth below, the Court finds Plaintiff has failed to meet his burden to show the applicability of an exception to the FSIA Defendants' immunity.

### i.  Ambassador Diakité's Implicit Waiver

Under 28 U.S.C. § 1605(a)(1), a foreign state is not immune from the jurisdiction of the courts of the United States or of the States where "the foreign state has waived its immunity either explicitly or by implication[.]"  Plaintiff argues Ambassador Diakité implicitly waived the FSIA Defendants' immunity during a dinner party on June 10, 2010.  (*See* Pl.'s Omnibus Mem. at 31, 49, 54-56.)  Specifically, Plaintiff asserts, that during the dinner party, he informed Ambassador Diakité about the publications of the Na Tchuto Photograph on the ANGOP website.  In response, Ambassador Diakité allegedly told Plaintiff:  "If the website in question is

that of ANGOP the government of the Republic of Angola will assume its responsibilities." (*Id.* at 55.)  Plaintiff also claims that Ambassador Diakité gave him her business card and "instructed Plaintiff not to discuss the case with anyone else and to send all documentation related to the case, directly to her." (*Id.*)  Plaintiff's waiver argument is meritless.

It is well settled that "the implied waiver provision of Section 1605(a)(1) must be construed narrowly."   *Smith v. Socialist People's Libyan Arab Jamahiriya ("Socialist People's")*, 101 F. 3d 239, 243 (2d Cir. 1996) (citations and internal quotations omitted).  An implied waiver is only found in "circumstances in which the waiver was unmistakable" and "unambiguous."   *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, 12 F. 3d 317, 325 (2d Cir. 1993).  Indeed, the legislative history of the FSIA provides only three examples of implicit waivers:  "when (1) a foreign state has agreed to arbitrate in another country; (2) a foreign state has agreed that the law of a particular country shall govern; or (3) a foreign state has filed a responsive pleading but has failed to raise the defense of sovereign immunity." *Cargill Intern. S.A. v. M/T Pavel Dybenko*, 991 F. 2d 1012, 1017 (2d Cir. 1993) (citing H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617). In reviewing the three examples set forth in the FSIA legislative history, the Second Circuit has concluded "that Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions *in relation to the conduct of litigation*."   *Socialist People's*, 101 F. 3d at 243-244 (emphasis added).

Here, Plaintiff provides no evidence or legal authority in support of his claim that the Ambassador's purported statement constituted an implicit waiver of the FSIA Defendants' immunity to suit.  Assuming, *arguendo*, the Ambassador even made the purported statement, it

was nevertheless uttered more than six months before Plaintiff initiated this lawsuit.[6]   Indeed, the statement, even if uttered, "contains no express or indirect reference to a waiver of sovereign immunity" and it "does not bear such a close relationship to litigation as to support an implied waiver." *Socialist People's*, 101 F. 3d at 245-56.   Accordingly, the Court finds Ambassador Diakité did not implicitly waive the FSIA Defendants' sovereign immunity.

ii.   <u>The Commercial Activities Exception</u>

Plaintiff maintains the "commercial activities exception" to the FSIA, 28 U.S.C. § 1605(a)(2), applies to ANGOP because it generates revenue through advertisements, thus conferring on the Court subject matter jurisdiction over the FSIA Defendants.   (*See* Pl.'s Omnibus Mem. at 56-65, 81.)   The FSIA Defendants argue that, even if ANGOP's actions are commercial in nature within the meaning of the FSIA, Plaintiff nevertheless has failed to meet all the elements of the commercial activities exception.   (Def. Mem. at 9.)   The Court finds the commercial activities exception is not applicable to the FSIA Defendants.

The commercial activities exception to the FSIA provides, in pertinent part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .
>
> (2) in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2).

"As is plain from the language of the section, each of its three clauses describes different

---

[6] While the purported dinner party occurred on June 10, 2010, Plaintiff did not initiate this suit until December 29, 2010.  (*See generally*, Summons with Notice.)

26

categories of conduct for which the foreign state is denied immunity." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F. 3d 69, 74 (2d Cir. 2010).  For the first or second clause of the commercial activities exception to apply, Plaintiff must show the commercial activity itself, or an act connected with the commercial activity, took place within the United States.  Throughout his Omnibus Memorandum Plaintiff speculates that the articles with the Na Tchuto Photograph might have been published in the United States, because ANGOP has some personnel deployed around the world as "Press Attaches" and because, according to Plaintiff, ANGOP's web server is located in Dallas, Texas.  (*See, e.g.,* Pl.'s Omnibus Mem. at 57, 89.)  Plaintiff provides no evidence to support this speculative assertion.  Moreover, while Plaintiff includes among his exhibits a printout from a website called "9rank.com" purporting to show ANGOP's website is hosted in Dallas, Texas, (*See* Ex. K, annexed to Pl.'s Omnibus Mem.), Plaintiff provides no evidence to suggest the articles in question were posted through the alleged server in Dallas.  In addition, in a supplemental sworn statement, Conceição affirms that "ANGOP's website is not hosted by any person or entity in the United States or elsewhere outside of Angola."  (September 16, 2011 Supplemental Sworn Statement of Manuel da Conceição, President, ANGOP Board of Directors ("Conceição Sept. Statement") ¶ 4, annexed as Attachment 2 to Defs.' Rep. Mem.) Accordingly, the Court finds Plaintiff has not met his burden to show that either the first or second clause of the commercial activities exception is applicable to the FSIA Defendants.

For the third clause of the commercial activities exception to apply, "the lawsuit for which jurisdiction is sought must be (1) based upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of the foreign state outside this country; and (3) that caused a direct effect in the United States." *Virtual Countries*, 300 F. 3d at 236 (citing *Republic of Argentina v. Weltover, Inc. ("Weltover")*, 504 U.S. 607, 611

(1992)).  To be a direct effect within the meaning of the third clause of the commercial activity

exception, "[t]he effect need not be substantial or foreseeable . . . but it must be something more

than trivial or incidental."  *Kensington Int'l*, 505 F. 3d at 157; *accord Virtual Countries*, 300 F.

3d at 236 ("Congress did not intend to provide jurisdiction whenever the ripples caused by an

overseas transaction manage eventually to reach the shores of the United States.").  An effect is

direct where "it follows as an immediate consequence of the defendant's activity." *Guirlando*,

602 F. 3d at 74 (quoting *Weltover*, 504 U.S. at 618) (internal citation, quotation marks, and

alteration removed).  The required "immediacy is lacking where the alleged effect depends

crucially on variables independent of the conduct of the foreign state." *Id.* at 75 (quoting *Virtual

Countries*, 300 F. 3d at 238) (internal quotation marks, and alteration removed).

Plaintiff asserts the publications of the Na Tchuto Photograph caused nineteen "direct

effects" on him in the United States.  (Pl.'s Omnibus Mem. at 59-64.)  However, many of the

purported direct effects are speculative in nature.  Indeed, Plaintiff's list of direct effects contains

a description of future and potential harms that "plaintiff believes he will suffer" as direct effects

of Defendants' actions.  (*Id.* at 59.)  By definition, these future or potential harms have not yet

occurred; *a fortiori* they cannot "follow as an immediate consequence of the defendant's

activity.'" *Guirlando*, 602 F. 3d at 74 (quoting *Weltover*, 504 U.S. at 618).  As such, Plaintiff's

speculative future harms are not direct effects of the FSIA Defendants' actions.

Plaintiff also purports, *inter alia*, that the direct effects of the FSIA Defendants' actions

include: (1) Plaintiff reliving the memories of an airplane explosion that occurred in 1998; (2)

Plaintiff living "with the consequences of having been removed [by Angola] from his position as

Spokesman of the United Nations in Angola" in the mid-1990s; (3) the theft by Ambassador

Diakité of an idea Plaintiff communicated to her for a new media project "a few years ago"; and

(4) Plaintiff no longer receiving invitations to "major" events in Washington D.C.   (Pl.'s Omnibus Mem. at 60-64.)   Plaintiff fails to show how these alleged harms, many of which occurred well before the publication of the Na Tchuto photographs, are the immediate consequences of the FSIA Defendants' activities or how they have had any impact in the United States.   As such, the commercial activities exception, premised upon these events, is inapplicable to the FSIA Defendants.

Plaintiff additionally contends that "[w]ithin minutes of opening the ANGOP web page, the Plaintiff became so upset he ended up in the hospital for emergency assistance . . . [a]s a result, the Plaintiff has been placed on preventative medication for the rest of his life."   (*Id.* at 59.)   Plaintiff provides a medical report from the hospital visit as evidence of his claim.   (*See generally* Ex. C (the "Medical Report"), annexed to Pl.'s Omnibus Mem.)   However, Plaintiff's own exhibit undermines his contention.   The Medical Report shows that Plaintiff attended a follow up appointment at a family health center where he complained of chest pain and dizziness that he reported was caused by an email he read.   Moreover, despite his allegation, Plaintiff was not "placed on preventative medication for the rest of his life."   Instead, Plaintiff was given a 90-day prescription for aspirin.   (*Id.*)   To the extent this is a direct effect of the FSIA Defendants' actions, it does not rise above the level of trivial or incidental.   *See Kensington Int'l*, 505 F. 3d at 157.   Accordingly, the third clause of the commercial activities exception is inapplicable to the FSIA Defendants.

### iii.   The Tortious Activity Exception

Plaintiff contends the "tortious activity exception" to the FSIA, 28 U.S.C. § 1605(a)(5), applies to Defendants, making them amenable to the Court's jurisdiction. (*See* Pl.'s Omnibus Mem. at 45-47, 73-74.)   Plaintiff's contention is meritless.

The tortious activity exception permits a court to exercise jurisdiction over a foreign sovereign where a plaintiff seeks monetary damages "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of [the] foreign state . . . ." *Swarna*, 622 F. 3d at 144 (quoting 28 U.S.C. § 1605(a)(5)) (alteration in the original). While this exception is "cast in terms that may be read to require that only the injury rather than the tortious acts occur in the United States, the Supreme Court has held that this exception 'covers only torts occurring within the territorial jurisdiction of the United States.'" *Cabiri v. Government of Republic of Ghana*, 165 F. 3d 193, 200 n.3 (2d Cir. 1999) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989)). In addition, the tortious activity exception does not apply to "any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 1605(a)(5)(B).

Here Plaintiff alleges six causes of action, all arising from the publications of the Na Tchoto photograph:

> defamation (libel); violation of right to privacy; harassment; negligence; threat to personal safety and life, through the unauthorized and multiple publication – by ANGOP (Angola Press Agency, the official news agency of the government of Angola) – of plaintiff's photographs and, false words, carried out with reckless disregard for its truth or actual malice on the internet, for commercial purposes (causing special damages).

(Summons with Notice at 5.) As a threshold matter, the tortious activity exception does not apply to the libel claim, as it is expressly barred by 28 U.S.C. § 1605(a)(5)(B). Moreover, while Plaintiff does allege that he suffered injury in the United States, as discussed *supra*, Part II.C.ii, Plaintiff fails to show that any of the FSIA Defendants' actions, tortious or otherwise, took place within the United States. Accordingly, the tortious activities exception is inapplicable. *See Doe*

*I v. State of Israel*, 400 F. Supp. 2d 86, 108 (D.D.C. 2005) (tortious activity exception inapplicable where plaintiff alleges she suffered emotional distress when she learned, from a television report she watched in the United States, that her family members were killed in the West Bank but where plaintiff fails to suggest defendants committed a tort on United States soil).

### D.  The Minsters, Conceição, and ANGOP Editorial Staff

Defendants argue that the action must be dismissed against the Ministers, Conceição, and ANGOP Editorial Staff (collectively, the "Individual Defendants") because the Individual Defendants have been sued in their official capacities and are not the real parties in interest in this case.  (Defs.' Mem. at 16-17.)  Plaintiff argues that, even though the Individual Defendants were sued in their official capacities, they nevertheless are amenable to suit and are the real parties in interest because of the corrupt political structure within Angola and the Individual Defendants are "enablers" of ANGOP's activities.  (Pl.'s Omnibus Mem. at 91-92.)  The Court finds the Individual Defendants are not the real parties in interest in this case and, as such, the case against them is dismissed.

While a foreign official sued in his official capacity for actions taken on behalf of a foreign state is not entitled to sovereign immunity under the FSIA, "some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest."  *Samantar v. Yousuf*, ⸺ U.S. ⸺, 130 S.Ct. 2278, 2289, 2292 (2010).  Indeed, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity." *Id*. at 2292 (quoting *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)) (emphasis in original).

Here, Plaintiff has sued the Individual Defendants only in their official capacities, for the

alleged wrongdoings of Angola and its political organs and agencies.  (*See, e.g.,* Pl.'s Omnibus Mem. at 94 ("The defendants have all been sued for the responsibilities assigned to them under the Constitution of Angola and the roles they play in their respective positions of responsibility[.]").)   Plaintiff argues that, owing to the alleged corrupt nature of Angola's political structure, there is no distinction between the private and public acts of Angola's government officials.  As such, Plaintiff contends that, even though the Individual Defendants have been sued in their official capacity, it is "perfectly legitimate to sue all defendants in this case, in the manner in which they have been sued."  (Pl.'s Omnibus Mem. at 91.)  The Court disagrees.

Regardless of the assertion Plaintiff makes about corruption in Angola's political structure, he alleges only that Angola and its political subdivisions and agencies undertook the purported wrongful acts at issue in this case.  Plaintiff makes no allegations against the Individual Defendants regarding actions taken by them outside of their respective roles in Angola's political structure.  As such, the real parties in interest in this case are Angola and its political institutions, all of which are immune from the jurisdiction of this Court.  Accordingly, because the Individual Defendants are not the real parties in interest in this case this action against them is dismissed.  *See Rahim v. Sec'y, Establishment Div., Gov't of People's Repub. of Bangladesh*, 2011 WL 3625580, at *2 (E.D.N.Y. Aug. 12, 2011) (action dismissed as to unnamed government official where the real parties in interest are the government of Bangladesh and its official agencies, which are immune from suit under the FSIA).

## IV.    Dismissal with Prejudice

Generally, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid

claim might be stated." *Cuoco v. Moritsugu*, 222 F. 3d 99, 112 (2d Cir. 2000) (internal quotation marks and citation omitted).  However, a court may deny an opportunity to amend "when amendment would be futile." *Fulton v. Goord*, 591 F. 3d 37, 45 (2d Cir. 2009) (internal quotation marks and citation omitted).  Here, it is clear that Plaintiff does not have any possibility of asserting a valid claim. Therefore, any attempt to amend the complaint would be futile.  *See Cuoco*, 222 F. 3d at 112 (denying leave to amend a *pro se* complaint where amendment would be futile).  Accordingly, the complaint is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss this case for lack of personal and subject matter jurisdiction is granted in its entirety.  Plaintiff's cross-motions are denied, and the complaint is dismissed with prejudice.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).


SO ORDERED.


Dated:  Brooklyn, New York
          August 22, 2012

_____/s/_____
          DORA L. IRIZARRY
          United States District Judge